UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

CATHLEEN SPITERI,

Plaintiff

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security Administration,

Defendant.

Case No. 3:16-cv-01937-LB

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

[Re: ECF Nos. 19 & 20]

## INTRODUCTION

The plaintiff Catherine Spiteri moves for summary judgment, seeking judicial review of a final decision by the Social Security Administration denying her disability benefits for claimed disabilities of vertigo, headaches, hyperlipidemia, hypertension, bilateral hyperopia with astigmatism, posterior vitreous detachments, very early cataracts, degenerative disc disease, obesity, and adjustment disorders with anxious mood.[1] The Administrative Law Judge ("ALJ") found that Ms. Spiteri had the severe impairment of vertigo and headaches but held at step three of the sequential evaluation that she did not meet or equal the criteria of any listing.[2] *See* 20 C.F.R

[1] Motion for Summary Judgment – ECF No. 19. Record citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated numbers at the top of the documents.

[2] Administrative Record ("AR") 28.

United States District Court
Northern District of California

§ 404.1520(4)(iii). The Commissioner opposes Ms. Spiteri's motion for summary judgment and cross moves for summary judgment.[3]

Pursuant to Civil Local Rule 16-5, the matter is submitted for decision by this court without oral argument. All parties consent to magistrate jurisdiction.[4] Upon consideration of the administrative record, the parties' briefs, and the applicable legal authority, the court grants the plaintiff's motion, denies the Commissioner's cross-motion, and remands for further administrative proceedings on the grounds that the ALJ erred by failing to consider Listing 11.03 at step three and failing to consider Ms. Spiteri's headache-related limitations in the residual functional capacity in the step four analysis. Furthermore, the ALJ failed to set out "clear and convincing reasons" for dismissing treating physician Dr. Siegel's medical opinion and consultive physician Dr. Katzenberg's medical opinion.

## STATEMENT

### 1. Procedural History

Ms. Spiteri filed her initial disability claim on May 2, 2014, alleging disability beginning March 31, 2014.[5] The Social Security Administration ("SSA") concluded that although Ms. Spiteri had medically determinable impairments, the limitations did not prevent her from performing relevant past work as a cashier, and thus it denied her claim on June 24, 2014.[6] After her request for reconsideration was denied on November 4, 2014, Ms. Spiteri requested a hearing before an ALJ on November 12, 2014.[7]

The hearing was held on June 10, 2015, in San Jose, California. Ms. Spiteri, represented by attorney Michael Egan, attended the hearing and testified. Impartial vocational expert ("VE")

---

[3] Cross-Motion – ECF No.20.

[4] Consent Forms – ECF No. 13, 14.

[5] AR 21.

[6] AR 92, 96–97.

[7] AR 122.

United States District Court
Northern District of California

Ronald Morrell also attended the hearing and testified.[8] The ALJ concluded Ms. Spiteri did not meet the SSA definition of "disabled" within the applicable period of March 31, 2014 to September 16, 2015, the date of the ALJ's decision.

The Appeals Council denied Ms. Spiteri's request for review.[9] In April 2016, Ms. Spiteri filed her complaint for judicial review.[10] In August 2016, she moved for summary judgment,[11] the SSA cross moved for summary judgment,[12] and Ms. Spiteri filed a reply brief.[13]

## 2. Summary of Record and Administrative Findings

### 2.1 Medical Records

#### 2.1.1 Dr. Michael Siegel: treating neurologist

Dr. Siegel has been treating Ms. Spiteri for approximately 13 years.[14] In March 2014, Ms. Spiteri saw Dr. Siegel at the San Mateo Medical Center for a one-year follow up appointment for her migraines.[15] Dr. Siegel's notes record Ms. Spiteri's experiencing two to three headaches per week.[16] He did not identify any neurological abnormalities during his physical examination of Ms. Spiteri.[17] Dr. Siegel saw Ms. Spiteri again on April 28, 2014.[18] Ms. Spiteri reported experiencing vertigo the previous week.[19] Dr. Siegel's medical notes describe Ms. Spiteri's neurological function as grossly normal and her mental function as alert and orientated.[20] Similarly, Dr. Siegel

---

8 AR 21.

9 *Id.*

10 Complaint – ECF No. 1.

11 Motion for Summary Judgment – ECF No. 19.

12 Cross Motion and Response – ECF No. 20.

13 *Id.*

14 AR 65.

15 AR 387.

16 AR 387.

17 AR 389.

18 AR 384.

19 *Id.*

20 AR 385.

described Ms. Spiteri's neurological function as grossly normal during an appointment on May 27, 20.[21] The medical notes describe Ms. Spiteri's migraines as "unspecified, without mention of intractable migraine."[22]

In September 2014, Dr. Siegel performed a Physical Capacities Evaluation.[23] Dr. Siegel diagnosed Ms. Spiteri as having chronic migraines and described her prognosis as uncertain.[24] Dr. Siegel estimated that Ms. Spiteri, if placed in a competitive work situation, could sit for 4 hours and stand or sit for 2 hours respectively.[25] While Dr. Siegel completed the part of the evaluation about whether Ms. Spiteri could lift or carry items ranging from 5 to 100 pounds during an 8-hour work day, he subsequently crossed out this information stating, "Disregard, can't manage 8 hour day."[26]

In April 2015, Dr. Siegel completed a "Medical Source Statement of Ability to do Work-Related Activities (Mental)," addressing how Ms. Spiteri's impairments affect her ability to carry out work-related activities on a sustained basis.[27] Ms. Spiteri's ability to understand, remember, and carry out short, simple instructions and make judgments on simple work-related decisions was moderately affected by her impairment.[28] Her ability to understand, remember, and carry out detailed instructions was markedly affected by her impairment.[29] Her impairment affected her ability to respond appropriately to supervision, co-workers, and work pressures in a work setting.[30] Her ability to respond appropriately to work pressures or changes in a routine work setting was

---

[21] AR 383.

[22] AR 383.

[23] AR 534.

[24] *Id.*

[25] *Id.*

[26] AR 535.

[27] AR 658.

[28] AR 658.

[29] *Id.*

[30] AR 659.

United States District Court
Northern District of California

moderately affected by her impairment.[31] Ms. Spiteri's ability to interact with the public, supervisors, and co-workers was slightly affected by her impairment.[32]

In May 2015, Dr. Siegel wrote a "Medical Report Verification of Physical/Mental Incapacity-General Assistance," concluding that Ms. Spiteri could not currently perform work but did not have a permanent disability.[33] The report also stated that Ms. Spiteri's condition did not permit her to undertake sedentary work or gardening.[34] Dr. Siegel concluded that Ms. Spiteri's condition required re-evaluation on July 15, 2015.[35]

**2.1.2 San Mateo Medical Center records**

Medical notes from San Mateo Medical Center record Ms. Spiteri at the Emergency Rooms ("ER") on multiple occasions between February 2014 and June 2015 with symptoms of vertigo and severe migraines.[36] On February 22, 2014, Ms. Spiteri attended the ER reporting dizziness worsening with head movement and positional changes.[37] Ms. Spiteri went to the ER again on February 25, 2014, reporting dizziness, a migraine, and nausea.[38] Ms. Spiteri described the dizziness as worsening whilst standing.[39] An MRI revealed minimal microvascular ischemic white matter changes but otherwise no abnormalities.[40] Ms. Spiteri presented at the San Mateo Medical Center ER again on May 20, 2014, reporting severe dizziness, vertigo, headaches, and nausea for over a day.[41] No neurological abnormalities were recorded.[42] On July 14, 2014, Ms. Spiteri again

[31] *Id.*
[32] *Id.*
[33] AR 661.
[34] *Id.*
[35] *Id.*
[36] AR 408, 402, 395, 490, 827, 821.
[37] AR 408.
[38] AR 402.
[39] AR 403.
[40] AR 378.
[41] AR 393.
[42] AT 395.

United States District Court
Northern District of California

sought treatment for vertigo at the San Mateo Medical Center ER, the onset having occurred 5 days earlier. [43] No underlying neurological problems were identified.[44]

Ms. Spiteri visited the ER on August 20, 2014, with a migraine, vertigo, and chronic back pain, having experienced the symptoms all night, with vomiting preventing her from taking her usual medication.[45] No unusual neurological symptoms were recorded.[46] On August 26, 2014, Ms. Spiteri visited the ER seeking treatment for vertigo, describing her symptoms as a "spinning, movement sensation, with nausea, lasting hours to days-daily."[47]

Ms. Spiteri attended San Mateo Medical Center for a medication refill on August 29, 2014. She reported experiencing three to four episodes per week, anxiety, and vertigo over the last three to four months, which come on randomly, lasting for a few minutes.[48]

**2.1.3 Psychological evaluations**

On September 25, 2014, Ms. Spiteri was examined by Psychology intern, Ms. Alicia Robinson, under the supervision of licensed psychologist Dr. Maria Moran to assess life stressors which could possibly exacerbate her severe migraines.[49] Ms. Spiteri presented with a positive attitude with an attempt to possibly mask heavier problems.[50] Ms. Spiteri stated she was looking for employment daily and was hopeful to find employment in a property-management position.[51] Ms. Spiteri described experiencing migraines "as often as 3 times per week" in addition to

[43] AR 490.
[44] AR 493.
[45] AR 827.
[46] AR 826.
[47] AR 821.
[48] AR 815.
[49] AR 798.
[50] AR 799.
[51] AR 799.

vertigo.[52] Ms. Spiteri rated the severity as 3–4 on a 10-point scale or 8–10 on a bad day.[53] The evaluation assessed Ms. Spiteri as having an adjustment disorder with anxious mood.[54]

Ms. Spiteri's medical notes show that she attended at least eleven other psychological appointments between September 2014 and March 2015.[55] Notes from a follow-up psychology appointment on October 6, 2014, record Ms. Spiteri's statements that she tried to keep busy in the shelter she was living in and engaged in computer job searching for two hours in the morning and evening.[56]

Medical notes from an additional psychology consult performed by Dr. Charlene Fuentes on October 28, 2014, concluded Ms. Spiteri did not meet the criteria for somatoform but that she might meet the criteria for undifferentiated somatoform.[57] During an evaluation two weeks later, Ms. Spiteri stated she experienced a migraine almost every day the previous week.[58] At an evaluation on December 31, 2014, Ms. Spiteri reported suffering migraines and vertigo on a daily basis when she woke up and also after spending long periods on her feet.[59] Ms. Spiteri referred to the possibility of employment in real estate and getting her real estate license during appointments on February 20, 2015, and March 17, 2015.[60]

#### 2.1.4 Dr. Daniel R. Katzenberg: Neurological Consultant

At the request of Social Services, Dr. Katzenberg, a neurologist at Ewing Diagnostics and Psychological Services, undertook a comprehensive neurological evaluation of Ms. Spiteri in January, 2015.[61] When discussing Ms. Spiteri's work-related abilities, Dr. Katzenberg concluded

---

[52] AR 800.

[53] *Id.*

[54] AR 806.

[55] AR 739, 745, 750,759,760, 764.

[56] AR 794.

[57] AR 784.

[58] AR 775.

[59] AR 764–765.

[60] AR 740–741, 746.

[61] AR 567.

that "[i]n terms of function, when she is having an attack of migraine or vertigo, she cannot do anything. She is simply bedridden for days at a time."[62] Conversely, Dr. Katzenberg concluded Ms. Spiteri had no physical limitations when she is not having an attack.[63] Due to Ms. Spiteri's baseline dizziness, Dr. Katzenberg advised against Ms. Spiteri lifting and carrying more than 20–30 pounds occasionally, and noted that such lifting and carrying should be limited to smooth surfaces.[64]

**2.1.5 Dr. Edward Koo: Ophthalmologist Consultant**

On October 30, 2014, again at the request of Social Services, Dr. Koo, an ophthalmologist at Peninsula Ophthalmology Group, examined Ms. Spiteri.[65] Dr. Koo's notes record Ms. Spiteri as having a history of meningitis/encephalitis 11–12 years ago resulting in "nystagmus, double vision, constant headaches, [and] vertigo 4–5 times per week."[66] While Dr. Koo noted that Ms. Spiteri had very early cataracts which should be monitored, he concluded that Ms. Spiteri had moderately good central and peripheral vision and that there appeared to be no ocular etiology for the vertigo.[67]

**2.1.6 Dr. F. Greene: Social Security Administration Evaluating Physician**

Dr. Greene, a SSA evaluating physician, completed a disability determination on Ms. Spiteri dated June 24, 2014.[68] During the medical portion of the disability determination, Dr. Greene noted the medically determinable impairment of vertiginous syndrome and other disorders, migraine, disorders of back (discogenic and degenerative), and essential hypertension.[69] Dr. Greene considered the medically determinable impairments could reasonably be expected to

---

[62] AR 569.
[63] *Id.*
[64] *Id.*
[65] AR 561.
[66] AR 562.
[67] *Id.*
[68] AR 89.
[69] AR 93.

produce Ms. Spiteri's symptoms and pain but the intensity, persistence, and functionally limiting effects of the symptoms were not substantiated by the objective medical evidence alone.[70]

Dr. Greene found that Ms. Spiteri had the following exertional limitations: (1) can occasionally (one third or less of an eight-hour day) lift or carry (including upward pulling) twenty pounds; (2) can frequently (more than one-third and up to two-thirds of an eight-hour day) lift or carry (including upward pulling) ten pounds; (3) can stand or walk, with normal breaks, for a total of six hours in an eight-hour work day; (4) can sit, with normal breaks, for a total of six hours in an eight-hour work day and (5) can push or pull, including hand and foot controls, for an unlimited time.[71]

Dr. Greene also found that Ms. Spiteri had postural limitations with respect with her ability to climb ropes, ladders, or scaffolds.[72] Due to Ms. Spiteri's history of vertigo, Dr. Greene concluded Ms. Spiteri should never climb ropes, ladders, or scaffolds.[73]

Based on the record evidence, Dr. Greene found that Ms. Spiteri's statements regarding her symptoms were not substantiated by objective medical evidence alone and although her statements were partially credible, the severity of the allegations were not fully supported by the evidence.[74]

Dr. Greene determined that although the impairments resulted in some limitations in Ms. Spiteri's ability to perform work, the limitations would not prevent Ms. Spiteri from performing work she had done in the past, such as a cashier.[75] Accordingly, Dr. Greene concluded that Ms. Spiteri was not disabled.[76]

---

[70] *Id.*

[71] AR 94.

[72] *Id.*

[73] *Id.*

[74] AR 93.

[75] AR 97.

[76] *Id.*

**2.1.7 Dr. B. Sheehy: Social Security Administration Evaluating Physician**

Dr. B. Sheehy, a SSA evaluating physician, completed a disability determination of Ms. Spiteri after she applied for reconsideration of her claim.[77] During the medical portion of the disability determination, Dr. Sheehy recorded medically determinable impairments of vertiginous syndrome and other disorders of vestibular system, disorders of back (discogenic and degenerative), and essential hypertension.[78] Dr. Sheehy concluded, however, that the severity of the allegations was not fully supported by the evidence.[79] Dr. Sheehy concurred with Dr. Green's conclusions with respect to Ms. Spiteri's exertional limitations.[80] Dr. Sheehy considered that Ms. Spiteri had sufficient residual capacity to perform past relevant work as a cashier and concluded she was not disabled.[81]

**2.2 Ms. Spiteri's Testimony**

Ms. Spiteri testified before the ALJ in June 2015.[82] Ms. Spiteri last worked as a cashier at TJ Maxx in March, 2014.[83] Following an onset of vertigo, Ms. Spiteri took a leave of absence from work, ultimately going on State Disability.[84] After six months TJ Maxx sent Ms. Spiteri a letter stating she would have to reapply for her position as a cashier.[85] Ms. Spiteri stayed on State Disability for a year.[86] After Ms. Spiteri's entitlement to State Disability ended, she received unemployment benefits until April, 2015.[87] While receiving unemployment benefits, and as a

---

77 AR 106.

78 AR 105–106.

79 AR 106.

80 AR 107.

81 AR 110.

82 AR 42.

83 AR 47.

84 *Id.*

85 AR 48.

86 AR 47.

87 AR 50.

condition for receiving it, Ms. Spiteri applied for jobs as a receptionist but was not successful in finding employment.[88]

Ms. Spiteri described the requirements of her previous jobs, testifying that her job at TJ Maxx was a customer service/cashier position which required her to stock shelves, break down boxes, hang up clothing on racks, and handle money.[89] Ms. Spiteri stated her job involved folding, bending, and walking.[90] Ms. Spiteri testified that she was predominantly required to stand up during her work hours.[91]

Prior to working at TJ Maxx Ms. Spiteri worked as a property manager at Heritage Reality.[92] The position was primarily an office job with activities encompassing answering phones, attending to customers, filing, computer work, and property inspections.[93] Ms. Spiteri inspected properties about once a week.[94]

Before working at Heritage Reality, Ms. Spiteri worked at Stanford Garden Apartments as a property manager. The job requirements were similar to those at Heritage Reality but required more physical labor because Ms. Spiteri cleaned inside apartments and cleaned and gardened around the complex.[95] Ms. Spiteri lost her job at Heritage Reality due to her absenteeism caused by her vertigo.[96] Prior to working at Heritage Reality, Ms. Spiteri worked as a waitress at Denny's Restaurant in Oakland for 13 years.[97]

Ms. Spiteri described the symptoms of her vertigo and migraines,[98]stating she experienced dizziness, nausea, and double vision.[99] Ms. Spiteri also stated that she frequently suffered from

---

88 AR 52.

89 AR 54.

90 AR 54.

91 *Id.*

92 AR 54–55.

93 AR 55.

94 *Id.*

95 AR 56.

96 AR 58.

97 AR 57.

98 *Id.*

migraines which lasted for three days, keeping her bedridden during that time.[100] During her migraines Ms. Spiteri experienced intense headaches, nausea, and dizziness.[101] Ms. Spiteri described the episodes of vertigo and migraines as coming on unexpectedly.[102]

**2.3 Vocational Testimony**

Vocational Expert Ronald Morrell testified at the hearing in June 2015. Mr. Morrell summarized Ms. Spiteri's past work[103] as a waitress, a cashier, a property manager, and a resident apartment house manager.[104] With respect to any skills from these jobs, transferable to sedentary work, Mr. Morrell testified that Ms. Spiteri's office skills — computers, typing skills, customer service, and records experience — made her well placed to be employed as a receptionist or information-clerk.[105] The ALJ asked how many receptionist and information clerk positions existed, and Mr. Morrell testified that, according to the US Department of Labor, there were approximately 1,400,000.[106] Mr. Morrell estimated that two thirds of this figure would consist of receptionist jobs, as most businesses have a receptionist but not all have information clerks.[107] Mr. Morrell testified that the vocational adjustment required from a property manager or resident apartment manager to an information clerk to be very little to slight.[108]

The ALJ then asked Mr. Morrell about the number of vacation and sick-leave days a person could expect as a receptionist or information clerk, or in any of the previous jobs Ms. Spiteri had held.[109] Mr. Morrell stated that typically employees in these positions received ten days leave a

---

[99] *Id.*

[100] AR 59.

[101] AR 60.

[102] AR 63.

[103] AR65-66.

[104] AR 67-68.

[105] AR 68.

[106] AR 69.

[107] *Id.*

[108] AR 70.

[109] AR 70–71.

United States District Court
Northern District of California

year.[110] The ALJ inquired as to whether vacation leave could be taken if an employee was suffering from medical problems and had no available sick leave.[111] Mr. Morrell testified that employees were free to use vacation leave as they pleased.[112] With respect to the ability to take unpaid leave, Mr. Morrell stated that taking more than three days of unpaid leave tended to be problematic for employees, but a receptionist or information clerk could remain employed, taking two or less days of unpaid leave a month.[113]

**2.4 Administrative Findings**

The ALJ held Ms. Spiteri was not disabled within the meaning of the Social Security Act from March 31 2014 to September 16 2015.[114] The Social Security Administration has a five-step evaluation process to determine if an individual is disabled. At step one, the ALJ must determine if the individual is engaging in "substantial gainful activity."[115] At step two, the ALJ must determine whether the individual has a "medically determinable impairment" that is "severe" or a combination of impairments that is "severe."[116] At step three, the ALJ must determine if the individual's impairments are severe enough to meet a listed impairment.[117] At step four, the ALJ must determine the individual's "residual functional capacity" and determine if the individual can perform any other work.[118] At step five, the ALJ must determine whether the individual is able to perform any other work, considering her residual functioning capacity, age, education, and work experience.[119]

---

110 AR 71-73.

111 AR 72.

112 AR 72.

113 AR 72-73.

114 AR 35.

115 AR 23.

116 AR 24.

117 *Id.*

118 AR 24.

119 *Id.*

At step one, the ALJ found that Ms. Spiteri had not engaged in substantial gainful activity since March, 31, 2014.[120]

At step two, the ALJ found that Ms. Spiteri had the following severe impairments: "vertigo and headaches."[121] The ALJ found that the other identified impairments—"hyperlipidemia, hypertension, bilateral hyperopia with astigmatism, posterior vitreous detachments, very early cataracts, degenerative disc disease, obesity, and adjustment disorder with anxious mood" — were non severe because the record did not establish that the conditions more than minimally limited Ms. Spiteri's ability to perform basic work duties.[122]

The ALJ pointed to a number of factors to support his finding that the above listed impairments were not severe. With respect to Ms. Spiteri's hypertension and hyperlipidemia, the ALJ found regular treatment and medication controlled the conditions.[123] The ALJ also noted that the visual impairments did not significantly affect Ms. Spiteri's ability to work, referring to evidence from Dr. Koo that Ms. Spiteri's visual clarity was 20/20 in her right eye and 20/30 in her left.[124] With respect to Ms. Spiteri's degenerative disc disease, the ALJ pointed to the absence of any evidence that the impairment resulted in any on-going limitation, noting that medical records reported no myalgias or arthralgias in a musculoskeletal examination and record of Ms. Spiteri's exhibiting normal gait and normal strength bilaterally.[125] The ALJ also noted that the record showed that Ms. Spiteri remained relatively active, engaging in activities such as cleaning out the closet at the shelter she was living in and delivering supplies to homeless people.[126]

In concluding that Ms. Spiteri's adjustment disorder with anxious mood did not, more than minimally, limit her ability to perform basic work activities, the ALJ considered four functional

---

[120] AR 25.

[121] *Id.*

[122] AR 25–27.

[123] AR 26.

[124] *Id.*

[125] *Id.*

[126] AR 26.

United States District Court
Northern District of California

areas to evaluate the severity of the mental impairment: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation.[127]

With respect to daily living, the ALJ relied upon documentary evidence where Ms. Spiteri stated she showers, eats, shops for groceries, carries small bags, drives an automatic car, and volunteers at the shelter she lives in.[128]

The ALJ concluded Ms. Spiteri's social functioning amounted to no more than mild difficulties.[129] In reaching this conclusion, the ALJ relied on medical notes describing Ms. Spiteri's presenting with an upbeat attitude and evidence that she maintains a healthy relationship with her children, despite current life stressors.[130]

In concluding that Ms. Spiteri's concentration presented no more than mild difficulties, the AJL pointed to evidence that Ms. Spiteri had made plans to obtain a real estate license and had consistently looked for work.[131]

Finally, with regard to episodes of decompensation, the ALJ held that the record did not establish that Ms. Spiteri had suffered such a severe loss of adaptive functioning three times in one year, each lasting for at least two weeks.[132]

At step three, the ALJ found that Ms. Spiteri did not have an impairment, or combination of impairments, that meets or is medically equal to the severity of one of the listed impairments in 20 CF.R. Part 404, Subpart P, Appendix 1 (20 C.F.R § 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).[133] In reaching this conclusion, the ALJ evaluated the impairments singly and in combination but found insufficient evidence to establish that the impairments equate to the level of severity listed in the Regulations.[134]

---

127 AR 27.

128 *Id.*

129 *Id.*

130 *Id.*

131 *Id.*

132 *Id.*

133 AR 28.

134 *Id.*

United States District Court
Northern District of California

At step four, the ALJ found that Ms. Spiteri had the residual functional capacity to perform the full range of light work as defined in 20 C.F.R § 404.1567(b) and 416.967(b).[135] The ALJ pointed to internal inconsistencies in Ms. Spiteri's testimony as to the range of daily exertional activities she could perform.[136] The ALJ considered Ms. Spiteri's statements as to the intensity, persistence, and limiting effects of the symptoms as not entirely credible.[137] The ALJ stated Ms. Spiteri's allegation of disabling impairment was inconsistent with her reported levels of activity and statements made elsewhere in the record.[138] In particular, the ALJ noted that Ms. Spiteri's repeated attempts to secure work demonstrated a self-assessed ability to work and that the record showed that during the adjudicative period, Ms. Spiteri intended to secure a real-estate license and consistently looked for work.[139]

Additionally, the ALJ concluded that Ms. Spiteri's allegations of disabling impairments were not supported by the medical record.[140] The ALJ found the Physical Capacities Evaluated completed by Dr. Siegel to be internally inconsistent (for example stating that Ms. Spiteri could sit for up to four hours a day and stand for up to two hours a day but not work), and not supported by any objective findings of functional limitation.[141] The ALJ pointed to contradictory parts of Dr. Siegel's medical notes which recorded Ms. Spiteri's neurological examinations as normal.[142]

The ALJ gave little weight to Dr. Siegel's opinions as to Ms. Spiteri's mental impairments.[143] The AJL considered Dr. Siegel's expertise as a neurologist not to be focused on disorders of the

---

[135] AR 28.

[136] AR 28–29.

[137] AR 28.

[138] AR 29.

[139] *Id.*

[140] *Id.*

[141] AR 31.

[142] *Id.*

[143] AR 31–32.

mind and, in any event, his medical notes made no mention of any significant psychiatric abnormalities.[144]

The ALJ considered Dr. Siegel's "Medical Report/Verification of Physical/Mental Incapacity" of May 11, 2015 to carry more weight.[145] In that report, Dr. Siegel stated Ms. Spiteri was not permanently disabled and her condition ought to be reevaluated on July 15, 2015.[146] The AJL pointed to a note in Dr. Siegel's records from April 6, 2015 — in which Dr. Siegel allegedly recorded that Ms. Spiteri was able to return to work — further supported the conclusion that she was not suffering from a disability.[147]

With respect to Dr. Koo's medical examination of Ms. Spiteri, the ALJ concluded his opinion rested on nothing more than Ms. Spiteri's own allegations and carried little weight.[148] The ALJ noted that Dr. Koo did not identify any abnormalities during his consultative visual examination of Ms. Spiteri, describing Ms. Spiteri as having moderately good central and peripheral vision.[149]

The ALJ concluded that Dr. Katzenberg's opinion carried little weight because his opinion that "the claimant cannot do anything" when experiencing migraine or vertigo was inconsistent with medical records.[150] For example, the ALJ stated that medical records show Ms. Spiteri is frequently able to function when suffering from symptoms of migraine or vertigo because she manages to obtain medical attention which requires movement outside and interaction with others.[151] The ALJ criticized Dr. Katzenberg's assigning Ms. Spiteri a more limited baseline functioning, stating it was contradictory given that Dr. Katzenberg recognized that Ms. Spiteri was limited only when suffering an episode of vertigo or a migraine.[152]

---

144 AR 32.

145 AR 32.

146 AR 661.

147 AR 32.

148 *Id.*

149 *Id.*

150 AR 32–33.

151 AR 33.

152 *Id.*

The ALJ also accorded little weight to the physical assessments performed by the State agency's medical consultants.[153] The ALJ stated the assessments contained little, if any, objective findings of functional limitation, no credible opinion establishing total inability to work, and only unsupported allegations of disabling impairment.[154]

The ALJ found that Ms. Spiteri was capable of performing past relevant work as a property manager and that such work did not require the performance of work-related activities precluded by her residual functional capacity.[155] While the ALJ recognized Ms. Spiteri was limited to performing light work, he considered the work of a property manager to be characterized as such.[156] In reaching this conclusion, the ALJ referred to the VE's testimony that standard industry benefits allow a worker at least ten vacation days per year to be used at the employee's discretion.[157] The ALJ considered that this benefit, in conjunction with any sick leave that Ms. Spiteri would likely receive, would accommodate any episodes of vertigo or migraine resulting in temporary severe limitation.[158]

Furthermore, the ALJ considered Ms. Spiteri's acquired work skills transferable to other jobs existing in significant numbers in the national economy.[159] In determining if Ms. Spiteri could make a successful adjustment to other work, the ALJ considered Ms. Spiteri's age, residual functional capacity, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2.[160] Based on an assessment of these factors the AJL determined that Ms. Spiteri was not disabled as defined in the Social Security Act.[161]

---

[153] AR 33.

[154] *Id.*

[155] *Id.*

[156] AR 34.

[157] *Id.*

[158] *Id.*

[159] AR 34-35.

[160] *Id.*

[161] AR 35–36.

**ANALYSIS**

**1. Standard of review**

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the SSA commissioner if the claimant initiates the suit within 60 days of the decision. District courts may set aside the commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole."42 U.S.C. § 405(g); *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal quotation omitted). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrew v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). If the evidence in the administrative record supports both the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *See id.*; *Tackett v. Apfel*, 180 F.3d 1094, 1097–98 (9th Cir. 1999).

**2. Applicable law**

An SSI claimant is considered disabled if he suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and the "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(A) & (B).

**2.1 Five-step analysis to determine disability**

There is a five-step analysis for determining whether a claimant is disabled within the meaning of the Social Security Act. *See* 20 C.F.R. § 404.1520. The five steps are as follows**:**

> **Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).

United States District Court
Northern District of California

> **Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).
>
> **Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).
>
> **Step Four.** Considering the claimant's residual functional capacity ("RFC"), is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).
> **Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2. *See* 20 C.F.R. § 404.1520(a)(4)(v).

For steps one through four, the burden of proof is on the claimant. *Tackett*, 180 F.3d at 1098. At step five, the burden shifts to the commissioner. *Id.*

### 3. Application

Ms. Spiteri submits that the ALJ erred in his decision by the following: (1) failing to consider a relevant medical listing, 11.03, at step three; (2) failing to consider any headache-related limitation in the residual functioning capacity assessment; (3) failing to evaluate the opinions of the treating neurologist and consultative examiner in a manner consistent with the regulations, Agency policy, and Ninth Circuit precedent; and (4) finding Ms. Spiteri's adjustment order to be non-severe.[162] In assessing Ms. Spiteri's residual functional capacity and according little weight to the opinions of treating and consultive physicians, the ALJ relied on Ms. Spiteri's testimony; the court thus considers the interplay of the testimony with the physician opinions.

[162] ECF No. 19 at 4.

**3.1 Relevant Medical Listings at Step Three**

Ms. Spiteri submits that the ALJ erred by failing to indicate whether he specifically considered Listing 11.03 in determining the plaintiff's migraine headaches did not medically equal the criteria of any listed impairment. Listing 11.03 states:

> 11.03 Epilepsy-nonconvulsive epilepsy (petit mal, psychomotor or focal) documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

In *Edwards v. Colvin,* No. 3:14-cv-05338-KSL, 2014 WL 7156846, at *3 (W.D. Wash. Sept. 15, 2014), the court held that, in a judicial review of an ALJ's denial of a claim for disability benefits arising from migraine headaches, the ALJ erred by failing to consider Listing 11.03. In reaching this conclusion, the court noted that "the Commissioner's own policy guidelines noted that Listing 11.03 was the most closely analogous listed impairments to migraine headaches" and that the defendant conceded the Commissioner assessed migraine headaches under 11.03. *Id*. The court also emphasized that Mr. Edward's reported symptoms were "not too dissimilar from the claimant described in the example rationale for finding medical equivalence with Listing 11.03", in particular symptoms of aura, alteration of awareness, and intense headache with throbbing, severe pain, nausea, and photophobia which lasted for anywhere between 4–72 hours and occurred more than twice a week. *Id*. These symptoms required the claimant to "lie down in a dark and quiet room for relief." *Id*. Although the ALJ in *Edwards* stated that she had considered the severity of Ms. Edward's migraine headaches in relation to the overall listings, she failed to specifically mention Listing 11.03; thus it was unclear whether she properly considered the listing. *Id*. The failure to mention the listing, combined with the finding that there was "at least a reasonable possibility that the plaintiff's migraines might have been found to be medically equivalent to Listing 11.03, led the court to conclude the ALJ had erred.

In the current case, the ALJ considered Ms. Spiteri's impairments singly and in combination but found insufficient evidence to establish to the level of severity described in any listing under the regulations.[163] In reaching this conclusion, the ALJ made no mention of Listing 11.03 The defendant asserts the Commissioner's policy guidelines, stating that migraine headaches are most closely analogous to Listing 11.03, are sub-regulatory statements of agency policy which do not impose judicially enforceable duties. But in *Edwards*, the defendant conceded the Commissioner evaluates migraine headaches under this listing. *Edwards v. Colvin,* No. 3:14-cv-05338-KSL, 2014 WL 7156846, at *3 (W.D. Wash. Sept. 15, 2014).

The Commissioner contends alternatively that even if the ALJ should have considered Listing 11.03, the plaintiff has not met her burden to present medical evidence satisfying the criteria of Listing 11.03. The Commissioner emphasizes that the ALJ found Ms. Spiteri's evidence that she experienced two to three migraines per week was not entirely credible and that the record contained no evidence of intractable migraines or evidence of abnormal MRI, CT Scan and ophthalmological examinations.[164] But there is no test for migraine headaches, and thus, "when presented with documented allegations of symptoms which are entirely consistent with the symptomatology" for evaluating migraines, the ALJ cannot reject the claimant's evidence on the mere absence of objective supporting evidence especially when — as here — it is supported by medical treatment records. *See Federman v. Charter,* No. 95 Civ. 2892 (LLS), 1996 WL 107291, at *2 (S.D.N.Y 1996).

As in *Edwards*, there is at least a reasonable possibility that Ms. Spiteri's migraines might have been found to be medically equivalent to Listing 11.03 if the ALJ properly considered the listing. Dr. Siegel treated Ms. Spiteri for over two years for her migraines, and she sought emergency medical treatment at least six times between February 2014 and June 2015.[165] She also takes prescribed medication for the symptoms.[166] Furthermore, Ms. Spiteri's symptoms are similar

---

[163] AR 28.

[164] ECF No. 20 at 4.

[165] AR 408, 402, 395, 490, 827, 821.

[166] AR 59–60.

to those in Listing 11.03. Her migraines keep her bedridden and sometimes last up to three days, and she experiences intense headaches, nausea, and dizziness.[167]

The defendant argues that Ms. Spiteri waived the issue by not raising Listing 11.03 with the ALJ or the appeals council.[168] For the reasons that the plaintiff advances, there is no requirement a claimant must specify the precise issue in its petition for review before the Council to later obtain judicial review. *Sims v. Apfel*, 530 U.S 103, 105, 107, 112 (2000). And on this record, the court holds that Ms. Spiteri adequately exhausted her administrative remedies.

**3.2 Headache-Related Limitations in the Step Four Analysis**

Ms. Spiteri argues that the ALJ did not consider the effect of her migraines on her RFC because he failed to address how her need to cease all activity until symptoms subside impacts her work.[169]

An ALJ is not required to make specific findings as to frequency, duration, and severity, but an assessment of the plaintiff's RFC needs to include an assessment of the plaintiff's ability to perform work on an on-going basis. *Miller v. Astrue,* No.CV-09-01871-PHX-JAT, 2011 WL 671752, at *14–15 (D. Ariz. Feb. 17, 2011). In *Miller v. Astrue*, the court held that the ALJ erred by failing to fully consider the effect of the plaintiff's migraine headaches on her RFC. *Id*. The court held that in the absence of an initial function-by-function assessment of the claimant's physical and mental capacities, it might not be possible to determine if the claimant can perform past relevant work. *Id*. Furthermore, the court held the ALJ's statement that the plaintiff would perform "light work" was conclusory and not the equivalent of undertaking an assessment of his ability to work on a regular and continuous basis.

*Miller v. Astrue* is similar to Ms. Spiteri's case. Although the ALJ accepted that Ms. Spiteri's detrimental impairments could reasonably be expected to cause the alleged symptoms, he

United States District Court
Northern District of California

[167] AR 59–60.

[168] ECF No. 20 at 4.

[169] ECF No 19 at 11–12.

concluded that her statements as to persistence, intensity, and limiting effects were not entirely credible.[170] After reaching this conclusion, however, he failed to assess, or state what he believed to be, Ms. Spiteri's ability to attend work on a regular and continuous. As in *Miller v. Astrue*, his conclusion that Ms. Spiteri had the ability to perform "light work" is conclusory and not a substitute for the requisite initial function-by-function assessment.[171]

In the event that the ALJ reaches step four of the sequential process on remand, the ALJ must identify Ms. Spiteri's functional limitations and assess her work-related abilities on a function-by-function basis.

**3.3 Ms. Spiteri's Testimony**

The ALJ's treatment of Ms. Spiteri's testimony is bound to his decision to discount the opinions of her treating and consultive physicians, and so the court considers it before it considers the evaluation of the physician opinions.

An individual's subjective complaints are not conclusive evidence of disability. 42 U.S.C §423(d)(5)(A) ("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability"); 20 C.F.R. § 404.1529(a) (an ALJ will consider "all [claimant's] symptoms, including pain, and the extent to which [claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence"). An ALJ must consider the entire case record when making specific credibility findings. *See Social Security Ruling* (SSR) 96-7p (the credibility finding "must be specifically sufficient to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight"); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002). An ALJ "must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas*, 278 F.3d at 958 (citing *Bunnell v. Sullivan*, 947 F.2d 341, 345-46

---

[170] AR 28.

[171] AR 33-34.

(9th Cir. 1991) (*en banc*)).

The ALJ relied upon Ms. Spiteri's testimony in accounting little weight to Dr. Siegel's and Dr. Katzenberg's opinions and in assessing Ms. Spiteri's residual functioning capacity at step four. Ms. Spiteri engages in some daily activities on days that she is not suffering from migraines such as searching for employment, tiding the shelter she lives in, and doing grocery shopping. Of course, "a claimant need not prove that he or she is completely bedridden or completely helpless to be found disabled." *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989); *see also Keller v. Shalala*, 26 F.3d 856, 859 (8th Cir.1994) (finding it error to discredit the claimant's subjective complaints of pain based on her daily activities which consisted of watching television, taking care of her dogs, and doing household chores, which claimant testified she could not do when she was suffering from a disabling headache); *Forehand v. Barnhart,* 364 F.3d 984, 988 (8th Cir.2004) ("We have long stated that to determine whether a claimant has the residual functional capacity necessary to be able to work we look to whether she has 'the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.' ") (citing *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir.1982) (en banc)).

Moreover, the ALJ — by discounting this testimony or at least not considering other medical evidence — did not make "specific findings relating to [the daily] activities" to support his conclusions. *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005). For example, he did not mention the number of times Ms. Spiteri sought emergency medical treatment for her symptoms and overlooked her consistent work history, a factor which ordinarily attracts substantial credibility when later claiming an inability to work due to disability. *Springer v. Colvin*, No. 1:13–CV185, 2014 WL 3075342, at *8 (N.D. Ind. July 2, 2014). The ALJ's characterization about Ms. Spiteri's testimony supported his decision to afford little weight to the medical evidence (discussed in the next section) and his ultimate conclusion that Ms. Spiteri had the residual functioning capacity to perform a full range of light work. Given that the consideration of her testimony is intertwined with the evaluation of the medical evidence, both must be reassessed on remand.

United States District Court
Northern District of California

**3.4 The AJL Erred By According Little Weight To Medical Evidence**

Social Security regulations identify three types of physicians: treating physicians; examining physicians; and non-examining physicians. 20 C.F.R. § 416.927(c), (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's." *Hollohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). The opinion of a treating physician is given the greatest weight because the treating physician is employed to cure and has a greater opportunity to understand and observe a claimant. *See Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996).

In determining whether a claimant is disabled, the ALJ must consider each medical opinion in the record, together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *Zamora v. Astrue*, No. C 09-3273 JF, 2010 WL 3814179, at *3 (N.D. Cal. Sept. 27, 2010). "If a treating physician's opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight.'" *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (quoting 20 C.F.R. § 404.1527(d)(2)). "If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [Social Security] Administration considers specified factors in determining the weight it will be given." *Id*. "Those factors include the '[l]ength of the treatment relationship and the frequency of examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician." *Id*. (citing 20 C.F.R. § 404.1527(b)(2)(i)-(ii)). "Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion[,] . . . the quality of the explanation provided[, and] the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion . . . ." *Id*. (citing 20 C.F.R. § 404.1527(d)(3)-(6)). Nonetheless, even if the treating physician's opinion is not entitled to controlling weight, it still is entitled to deference. *See id*. at 632 (citing

SSR 96-02p at 4 (Cum. Ed. 1996)). Indeed, "[i]n many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." (SSR 96-02p at 4 (Cum. Ed. 1996)).

Accordingly, "[i]n conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527). "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Id.* (quotation and citation omitted). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may reject it only by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (quotation omitted). Opinions of non-examining doctors alone cannot provide substantial evidence to justify rejecting either a treating or examining physician's opinion. *See Morgan v. Comm'r of Soc. Sec. Admin*, 169 F.3d 595, 602 (9th Cir. 1999). An ALJ may rely partially on the statements of non-examining doctors to the extent that independent evidence in the record supports those statements. *Id.* Moreover, the "weight afforded a non-examining physician's testimony depends 'on the degree to which they provide supporting explanations for their opinions.'" *See Ryan*, 528 F. 3d at 1201 (quoting 20 C.F.R. § 404.1527(d)(3)).

SSR 96-97p defines the need to support a patient's subjective complaints with medical evidence: "no symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signed and laboratory findings demonstrating the existence of a medically determinable impairment." The Act permits the determination of impairment by means of "medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). In *Dalley v. Commissioner of Social Security*., No. C 00-01687 VRW, 2006 WL 2578269, at *5 (N.D Cal. Sept. 6, 2006) the court held "this use of this disjunctive leaves little doubt that "clinic diagnostic techniques" are a legally acceptable substitute for laboratory diagnostic techniques."

Dr. Siegel treated Ms. Spiteri on a regular basis, and both Dr. Katzenberg and Dr. Koo saw her during the relevant period. All three relied on Ms. Spiteri's reports of severe headaches and

evaluated her as clinicians. There is not otherwise definitive proof (such as laboratory or testing results) that could unequivocally establish the frequency or intensity of Ms. Spiteri's symptoms. But the ALJ identified nothing to support his reasons for rejecting the treating and consultive physicians' opinions.

For example, there are no clear and convincing reasons to support the ALJ's decision to accord little weight to Dr. Siegel's uncontradicted opinion in the September 18, 2014 Physical Capabilities Evaluation. The ALJ held that Dr. Siegel's opinion that Ms. Spiteri could not work an eight-hour day was inconsistent with his own treatment notes and other medical notes on record.[172] The ALJ pointed to internal inconsistencies in the notes such as originally reporting Ms. Spiteri could sit for four hours, stand for two hours, and walk for two hours a day, but that she could not work eight hours.[173] The ALJ read this as inconsistent: if the plaintiff could sit, stand, and walk for eight hours a day, then she should be able to work an eight-hour day. This is not obviously inconsistent, is in any event conclusory, and is not supported by the record (or clear and convincing reasons). The court also does not see how crossing out a statement as something to be disregarded is inconsistent.[174] The ALJ paid no regard to Dr. Siegel's long-term treatment of Ms. Spiteri for thirteen years overall, with treatment for migraine headaches beginning in 2013.[175] Furthermore, the perceived inconsistencies — cited in support of the decision to discount Dr. Siegel's opinion — are in any event not consistent with other substantial evidence in the record. To the contrary, the record when viewed as a whole illustrates that Ms. Spiteri has regularly sought medical treatment for migraine headaches since 2014, sometimes through emergency treatment, and consistently reported suffering symptoms of intense headaches, dizziness, throbbing, and nausea. In the absence of Dr. Siegel's opinion being inconsistent with other substantial evidence in the record, his opinion as a treating physician ought to have been given controlling weight.

---

[172] AR 31.

[173] AR 664-665.

[174] AR 665.

[175] AR 65, 387.

The ALJ considered Dr. Siegel's opinion of May 11, 2015, to carry more weight, but he misread the contents of the report, and as a result, he concluded that the opinion suggested Ms. Spiteri had an ability to work.[176] This is incorrect. The Medical Report/Verification of Physical/Mental Impairment states that while Ms. Spiteri's impairment is not permanent, she is unable able to work.[177] Furthermore, nothing in Dr. Siegel's medical notes from April 6, 2015 says that Ms. Spiteri is able to return to work.[178] The ALJ can reconsider the evidence on remand.

The ALJ also erred in his approach to Dr. Katzenberg's evidence. Dr. Katzenberg opined that Ms. Spiteri could work without limitation, or (inconsistently) with some (non-disabling) limitations, when not experiencing migraine headaches.[179] But Dr. Katzenberg also stated that Ms. Spiteri could not do anything when suffering from a migraine headaches.[180] The ALJ rejected this evidence on the basis that it primarily was based upon the plaintiff's subjective allegations.[181] The ALJ also concluded that Dr. Katzenberg's opinion that Ms. Spiteri cannot do anything when experiencing a migraine headache was inconsistent with looking for permanent work on a computer and occasionally volunteering at the shelter.

Reliance on a claimant's reported symptoms that are consistent with the symptomology for evaluating migraines is not erroneous. Thus, the ALJ erred by rejecting Dr. Katzenberg's opinion. Contrary to the ALJ's conclusion, there is no inconsistency between Dr. Katzenberg's opinion and Ms. Spiteri's testimony. To the contrary, Ms. Spiteri's testimony — that she looked for work, helped tidy the shelter, and engaged in other volunteer work for the shelter — is consistent with Dr. Katzenberg's opinion that she could work when she is not experiencing migraine headaches.

---

[176] AR 32.

[177] AR 661.

[178] AR 717–720.

[179] AR 569.

[180] AR 569.

[181] AR 33.



United States District Court
Northern District of California

United States District Court
Northern District of California

**3.4 The ALJ Did Not Err In Finding Ms. Spiteri's Adjustment Disorder to be Non-Severe**

The plaintiff has the burden to prove the existence of a severe impairment. *See Tidwell v. Apfel*, 161 F.3d 5999, 601 (9th Cir. 1998). Pursuant to the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). "Basic work activities" are defined as including such capabilities as use of judgment, 20 C.F.R § 404.1521(b)(4); responding appropriately to supervision, co-workers and usual work situations, 20 C.F.R. § 404.1521(b)(5); and dealing with changes in a routine work setting, 20 C.F.R. § 404.1521(b)(6).

The record illustrates that Ms. Spiteri was diagnosed as having adjustment disorder with anxious moods.[182] The record also shows that Ms. Spiteri received treatment and medication related to this disorder.[183] The conclusion that this impairment was non-severe is not based on any legal errors and is not unsubstantiated with regards to the record of evidence in its entirety. 42 U.S.C § 405(g). To the contrary, the ALJ referred to the record at length in considering four broad functional areas to evaluate the severity of the mental impairment.[184] The record wholly supports the ALJ's finding that Ms. Spiteri's mental impairment placed no more than mild restrictions on her daily living, social functioning, concentrating, and decompensation.

The ALJ in a social security case has an independent duty to fully and fairly develop the record and to assure that the claimant's interested are considered. *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir. 2001)(quoting *Smolen v. Charter*, 80 F.3d 1273 at 1288). The ALJ did not breach this duty. The medical evidence does not point to Ms. Spiteri's mental impairment being a significant factor affecting her ability to work. At most, her adjustment disorder with anxious mood appears secondary. The ALJ's decision with respect to Ms. Spiteri's adjustment disorder with anxious moods is supported by substantial evidence and is therefore upheld.

---

182 AR 796.

183 AR 664.

184 AR 27.

United States District Court
Northern District of California

## CONCLUSION

Ms. Spiteri's motion for summary judgment is granted, the Commissioner's cross motion for summary judgment is denied, and the case is remanded for further proceedings consistent with the order. This disposes of ECF Nos. 19 and 20.

**IT IS SO ORDERED.**

Dated: December 23, 2016

LAUREL BEELER
United States Magistrate Judge